**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

DEREK DE JONG, AND
JOHN DOES 137-139,

                Plaintiffs,

    v.

THE OHIO STATE UNIVERSITY,

                Defendant.

Case No. 2:19-cv-5551

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs Derek de Jong and John Does 137-139 file this Complaint against Defendant, The Ohio State University ("OSU" or the "University"). This is a companion case to five cases: *Michael DiSabato and John Does 1-36 v. The Ohio State University*, **Case No. 2:19-cv-02237;** *John Does 37-66 v. The Ohio State University*, **Case No. 03165;** *John Does 67-88 v. The Ohio State University, Case No. 04397; John Does 88-94 v. The Ohio State University,* **Case No. 04624;** *and Dave Beaudin, Mathew Barclay and John Does 95-136 v. The Ohio State University,* **Case No. 04634**. **This case also has common issues of law and fact with other cases regarding The Ohio State University, including 2:18-cv-692, 2:18-cv-736, and Case No. 2:19-cv-1911.** Plaintiffs therefore anticipate that the Court will consolidate this case with the foregoing cases pursuant to its March 15, 2019 Order, ECF No. 69, 2-18-cv-692.

Plaintiffs allege that Defendant violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, as follows:

JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 because Plaintiffs allege claims under federal law, specifically Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

2.      Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred within this district.

PRELIMINARY STATEMENT

3.      Plaintiffs bring this civil rights lawsuit under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* because OSU had actual notice of and was deliberately indifferent to the fact that Richard Strauss, M.D., an OSU employee, tenured faculty member, and the Associate Director of OSU's sports medicine program, sexually assaulted and abused hundreds of male OSU student-athletes and other male OSU undergraduates throughout his almost twenty-year career with the University.  OSU officials not only had actual notice of Strauss's criminal and unlawful actions, they aided, abetted, and actively concealed Strauss' sexual predation on OSU's students.

4.      As a threshold matter, Plaintiffs admit they consented to receiving medical treatment while student-athletes at OSU.  Plaintiffs, however, did not consent to Strauss doing or saying anything that was medically unwarranted, inappropriate, or unethical.  For numerous reasons described below, Plaintiffs were not in a position to judge Strauss' clinical practices or to avoid him when seeking medical care.

5.      Strauss abused Plaintiffs during pre-season physicals and when treating them for injuries, either through the OSU Athletics Department or OSU's Sports Medicine Clinic at Student Health Services. He also sexually harassed student-athletes in the locker rooms and

showers of Larkins Hall, where many teams were based, including wrestling, gymnastics, and swimming.

6.     On information and belief, OSU assigned Strauss a locker in *every room* used by male athletes for the teams based in Larkins Hall.

7.     Strauss also used his access to students to sexually assault/abuse students that were not part of intercollegiate sports.

8.     OSU designated Strauss as a team physician for many sports.  Student-athletes could not avoid him if they wanted medical treatment.  OSU funneled Plaintiffs and other student-athletes to Strauss with assembly-line efficiency, whereupon Strauss cornered and sexually assaulted them. He sexually assaulted/abused most of the Plaintiffs more than once, and some wrestlers between 20-50 times.

9.     OSU concealed, intentionally ignored, or disregarded athletes' repeated reports and other widely known information that indicated Strauss was a threat to his male patients.  A Graduate Assistant Trainer who overlapped with Strauss only one academic quarter noticed "immediately" that something was "off" with Strauss.  "In her view, individuals who overlapped with Strauss for any significant period of time would have had to have their 'ear plugged, eyes shut, and mouth closed not to realize something was off.'" *Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, Report of Perkins Coie, LLP, May 15, 2019, p. 104 ("Report"). Officials turned a blind eye to numerous red flags that Strauss was sexually abusing his patients, such as: Strauss insisted upon examining patients without any other staff being present, including students in training; Strauss performed notoriously long and thorough "hernia checks" during team physicals; athletes' openly commented on the fact that Strauss made them drop their pants regardless of their medical needs (e.g., to get a case of cauliflower ear

treated); and the fact that Strauss showered with athletes from multiple teams, often took multiple showers a day, and requested (and received) multiple lockers in Larkins Hall.

10.     There were other clear signs of Strauss' predatory behavior. When teams reported for pre-season physicals, Athletics Department personnel set up stations for each station of the physical. Strauss always chose to man the "hernia check" station.  He took an extended amount of time with each athlete patient and examined each patient in a room with the door closed. Strauss' "hernia checks" frequently took several minutes. Some lasted as long as ten or fifteen minutes. A line would form outside of Strauss' exam room as the athletes completed the other stations for their physicals and anxiously waited for Strauss to exam them.  Strauss' prolonged genital exams were well-known to the athletes he examined, Athletics Department personnel, and team coaches. At least one team head coach requested that someone other than Strauss conduct the hernia checks for team physicals because his athletes complained so much about Strauss' methods.

11.     Strauss disguised his sexual assaults in the context of medical examinations.  He frequently positioned Plaintiffs so that his face was at the same height as their crotches. Strauss placed his face so close to his patients that they could feel his breath on their genitals.  Other times he had them sit on a bench and spread their legs; he would then roll across the floor on a wheeled stool and stick his face deep between their legs to perform his exam.  Sometimes Strauss donned a headlamp and turned off the room lights before putting his head inches away from patients' penises. When Plaintiffs asked Strauss why such in-depth and lengthy genital inspections were necessary, or why he was massaging their genitals, probing their rectums, or doing or saying other harassing and inappropriate things, Strauss came up with many different medical explanations. Hernia and lymph node checks were a common explanation.  When one

Plaintiff asked Strauss to explain the room lights off/headlamp behavior, Strauss said he was checking for skin rashes and STDs. He assured the Plaintiff that this technique allowed him to perform the best possible examination for those kinds of problems.

12.     Strauss also sexually assaulted students by performing anal and rectal exams that were rigorous, lengthy, and medically unnecessary. Although less common than genital exams, they occurred frequently. They were profoundly embarrassing and humiliating to the Plaintiffs who endured them. Numerous Plaintiffs were assaulted in this manner.

13.     Some of the Plaintiffs and other student-athletes reported Strauss' examination methods to team trainers – particularly football trainer Billy Hill. While precise responses differed, the gist was almost always the same: it was not a big deal; Strauss did things his way; Strauss was just being thorough; and/or this had gone on for years.  Other benign explanations were offered. Some Plaintiffs came to believe that Strauss' examinations were a  necessary part of their participation in intercollegiate athletics that was like a "hazing."

14.     In April 2018, OSU authorized the law firm of Perkins Coie, LLP to investigate whether Strauss had sexually abused student-athletes, and if so, the extent to which OSU knew about Strauss' conduct. Perkins Coie, LLP conducted its investigation and issued the Report on May 15, 2019.  The Report substantiates many of the allegations made by Plaintiffs in this case and in other Title IX cases presently pending before this Court.[1] *See, e.g., Brian Garrett et. al. v. The Ohio State University*, Case No. 2:18-cv-00692-MHW-EPD (S.D. Ohio); *Steve Snyder-Hill et. al. v. The Ohio State University*, Case No. 2:18-cv-00735-MHW-EPD.

15.     John Does 95-136 have filed anonymously in this action due to the highly personal nature of the circumstances giving rise to their claims.

_____

[1] Materials received from Ohio's Medical Board Contents are redacted from the current version of the Report.

16.     Plaintiffs take no pleasure in bringing this lawsuit. OSU is an esteemed institution of higher learning, and a majority of the Plaintiffs love OSU dearly and remain devoted members of The Buckeye Nation.

17.     Plaintiffs were honored to represent OSU in competitive sports and did their best to continue the University's tradition of excellence.

18.     Plaintiffs attended OSU expecting the University would consistently provide them with a safe and supportive environment that would help them perform at their best, both athletically and academically.

19.     Plaintiffs believed that OSU would make patient/athlete safety one of the University's primary concerns.

20.     Team physicians hold a special relationship of trust and confidence with the student-athletes they treat.

21.     Plaintiffs trusted OSU to act in their best interests when selecting, training, and supervising the team physicians on its faculty.

22.     Plaintiffs trusted OSU to hire physician faculty members who would respect and honor the relationship of trust and confidence that must be present between patients and their physicians.

23.     Plaintiffs trusted OSU to regularly and competently evaluate the quality and integrity of the medical services Strauss provided to Plaintiffs.

24.     Plaintiffs trusted OSU to investigate faithfully all circumstances that indicated a team physician was unfit to treat Plaintiffs, whether due to acts of sexual assault/abuse or incompetence.

25.     Plaintiffs trusted that OSU personnel would not hide, fail to disclose, or disregard known circumstances that raised a substantial likelihood the Plaintiffs or other student-athletes were being sexually assaulted, abused, or harassed by Strauss and/or by conditions at Larkins Hall.

26.     Plaintiffs expected OSU, an esteemed institution of higher learning, to investigate the truth about Strauss' conduct in a timely and competent manner, regardless of how unfavorable findings might affect the University's reputation or athletics programs.

27.     Plaintiffs relied on OSU to confront and stop Strauss' sexual abuse of Plaintiffs and other male OSU students.

28.     Plaintiffs relied on OSU to stop the rampant sexual harassment that student-athletes, particularly the wrestling team, had to endure in Larkins Hall between 1978 and 1998.

29.     OSU betrayed Plaintiffs' trust and utterly failed to meet the legal and ethical obligations it owed to Plaintiffs and other OSU students.  At all times relevant to this Complaint, OSU officials with authority to institute corrective measures actively concealed, failed to disclose, and showed deliberate indifference towards circumstances that indicated Strauss was sexually assaulting and abusing many male OSU athletes he treated.

30.     On information and belief, OSU personnel who failed to implement corrective measures despite having actual knowledge of: (a) the risk that Strauss was sexually assaulting students, and (b) the sexually hostile environment Larkins Hall presented to athletes on the teams housed there included (but were not limited to) Athletic Directors and Assistant Athletic Directors, Head Team Physicians, and team physicians (who were also faculty members).

31.     At all times relevant to this Complaint, OSU maintained a culture of concealment, denial, and unwillingness to investigate sexual abuse and sexual harassment of male athletes at

the University. This culture led to OSU's active concealment of and deliberate indifference towards continuous complaints and reports about Strauss' behavior and the conditions at Larkins Hall. Consequently, Strauss remained hidden in plain sight and continued to abuse Plaintiffs and other patients throughout his career at the University. Plaintiffs on teams housed in Larkins Hall continued to be harassed on a daily basis. Both of these threats to student safety remained unabated for approximately twenty years.

32.     Only within the past two years have Plaintiffs realized that Strauss' conduct constituted sexual assault or sexual abuse.

33.     Only within the past two years have Plaintiffs had a reasonable basis for believing that OSU had actual knowledge of the risk Strauss presented to the student-athletes he treated.

34.     Only within the past two years have Plaintiffs had a reasonable basis for believing OSU intentionally concealed or showed deliberate indifference to the threat Strauss posed to them.

35.     Only within the past two years have the Plaintiffs had reason to know that OSU administrators in a position to take corrective measures knew about sexually harassing environment that students and male athletes endured each day in Larkins Hall.

36.     Even if Plaintiffs had realized more than two years ago that Strauss' conduct constituted sexual assault and sexual abuse, Plaintiffs would have had no reasonable basis for alleging or concluding that OSU harmed them separately and independently from the harm that Strauss inflicted on them. Strauss harmed Plaintiffs by sexually assaulting and abusing them. OSU separately and independently harmed Plaintiffs by failing to protect them from Strauss despite knowing Strauss was substantially likely to be a sexual predator. Not until within the past two years would Plaintiffs' due diligence have allowed them to reasonably infer: (a) what

OSU knew about Strauss while Strauss was on the faculty; or (b) what OSU did or failed to do with that information.

37. Likewise, not until within the past two years would the Plaintiffs whose teams practiced in Larkins Hall have known: (a) the extent of OSU's institutional knowledge about the conditions in Larkins Hall; or (b) what OSU did or failed to do with that information.

<u>THE PARTIES</u>

38. Defendant The Ohio State University was at all relevant times and continues to be a public university organized and existing under the laws of the State of Ohio.

39. Defendant OSU receives, and at all relevant times received, federal financial assistance. Defendant is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*

40. Plaintiffs were enrolled at OSU as students during Strauss' employment with OSU.

41. Most Plaintiffs participated in OSU intercollegiate sports teams while enrolled at OSU.

42. Plaintiffs received financial assistance from OSU. Most financial assistance was linked to their participation on OSU's intercollegiate sports teams.

43. Derek de Jong is a resident of the Province of Nova Scotia, Canada.

44. Derek attended OSU from 1990 to 1995 and was a member of the men's swim team while attending OSU. Derek was sexually assaulted/abused by Strauss at least 4 times. Strauss showered in the locker rooms, took pictures of Derek, masturbated in front of Derek, and positioned himself invasively when performing his examinations.

45.     During the physical exams Strauss rubbed Derek's testicles and placed his hand around his penis. Strauss also pressed his body against Derek while holding Derek's penis. During one examination, Strauss ran one of his fingers between Derek's legs and Strauss entered his finger into Derek's anus and when Derek pulled away, Strauss said "I have to give you a good exam." Strauss attempted to sexually assault Derek another time in 1994 during an exam for severe sinusitis, but Derek pushed Strauss off before he could. Derek quit swimming because of Strauss.

46.     Plaintiff John Doe 137 is a resident of the State of New York.

47.     John Doe 137 attended OSU from 1980 to 1985 and was a member of the men's soccer team for three years while he attended OSU.

48.     Strauss treated John Doe 137 approximately 25 times while John Doe 137 was on the soccer team. Of those 25 times, Strauss sexually assaulted/abused John Doe 137 at least 18 times. Strauss sexually assaulted/abused John Doe 137 every time by conducting long genital exams where Strauss would excessively grope/fondle John Doe 137's genitals in a manner that made John Doe 137 feel very uncomfortable and felt sexual rather than clinical. Strauss would perform these inappropriate exams, even when John Doe 137 sought treatment for Hay Fever.

49.     John Doe 137 recalls Strauss on many occasions showering with the soccer team, creating a very uncomfortable environment for John Doe 137.

50.     John Doe 138 is a resident of the State of Ohio.

51.     John Doe 138 attended OSU from 1993 to 1996. John Doe 138 was not a member of a sports team at OSU.

52.     Strauss treated John Doe 138 for a physical on one occasion. Before the exam began, Strauss made John Doe 138 completely disrobe. Strauss sexually assaulted/abused John

Doe 138 during this exam by conducting a long genital exam where Strauss would excessively grope/fondle John Doe 138's genitals in a manner that made John Doe 138 feel very uncomfortable and felt sexual rather than clinical. Strauss positioned himself invasively when performing this examination and was not wearing gloves during this examination.

53.    John Doe 139 is a resident of the State of Mississippi.

54.    John Doe 139 attended OSU on or about 1988 to 1992. He was not a member of any sports team while at OSU.

55.    Strauss treated John Doe 139 on at least three different occasions. Strauss sexually assaulted/abused John Doe 139 during every exam by conducting long genital exams where Strauss would excessively grope/fondle John Doe 139's genitals in a manner that made John Doe 139 feel very uncomfortable and felt sexual rather than clinical.

56.    John Doe 139 recalls during multiple exams, Strauss asking him to get an erection.

<u>STRAUSS</u>

57.    OSU employed Richard Strauss, M.D., as a faculty member from September 1978 until March 1, 1998.

58.    In 1978, Strauss was hired as an Assistant Professor of Medicine in the Pulmonary Disease Division of the Department of Medicine.

59.    By 1980, Strauss was Associate Director of the Sports Medicine Program.  In 1981, Strauss began an appointment in the Athletics Department and expanded his clinical duties to the Sports Medicine Clinic at University Health Services.  By 1982, Strauss' primary affiliation was with the Department of Preventive Medicine.

60.     OSU granted Strauss tenure as an associate professor in 1983. OSU made Strauss a full professor with tenure in 1992.  Strauss voluntarily retired in March 1998 and was approved by the Board of Trustees for emeritus status in the School of Public Health. Emeritus status was granted without the review or approval of the Dean of the College of Medicine and Public Health. (Report, p. 31,32.)

61.     Throughout his employment, Strauss provided medical services to various OSU sports teams.  Strauss initially served as a team physician for the wrestling, swimming, and gymnastics teams, which were based at Larkins Hall.  At that time, Larkins Hall was OSU's physical education building and aquatics facility.

62.     "Over the years, Strauss' responsibilities as a team physician expanded beyond just the teams based out of Larkins, and included assignments with teams and in facilities across campus[,]" (Report at 2.) Around 1980, Strauss began treating patients at the Sports Medicine Clinic at Student Health Services. He was ultimately appointed Chief Physician of the Sports Medicine Clinic.  As time went on, Strauss treated students "who participated in a wide range of sports including hockey, cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football." (*Id.* at 34).

63.     Strauss' appointment with Student Health ended in 1996 following an investigation into student complaints about Strauss' sexual misconduct during medical exams.

<u>STRAUSS' ACTS OF SEXUAL ASSAULT AND ABUSE</u>

64.     Strauss abused Plaintiffs and OSU students in one or more of the following ways (as categorized by the Report):

    a.  In the context of a medical examination that caused the student to reach ejaculation or nearly reach ejaculation;

b. In the context of a medical examination that caused the student to reach erection or nearly reach erection;

c. Unnecessary fondling or groping of genitals in the context of a medical examination, or medically unnecessary examinations of the genitals or rectum.

d. Examination techniques that included: unnecessary nudity; excessive touching of non-genital/non-rectal areas of the student's body; inappropriate verbal commentary or sexually charged questioning; lack of medical gloves for genital examinations; unnecessarily invasive physical positions; medical treatment outside a clinical setting; and *quid pro quo* arrangements; and

e. Inappropriate and sexually abusive conduct outside of the examination room, including showering alongside student-patients, loitering in student-athletes' locker rooms and engaging in voyeuristic behavior, and initiating fraternization with patients. (Report at 39)

65. Strauss committed these acts of sexual abuse and harassment consistently and on a daily basis throughout his career at OSU.

66. Strauss committed these acts of sexual abuse while an OSU faculty member.

WHY PLAINTIFFS' HAD DIFFICULTY REALIZING OR
REPORTING STRAUSS' CONDUCT AS SEXUALLY ABUSIVE

67. Plaintiffs were vulnerable to Strauss' sexual abuse and many were not able to identify Strauss' conduct as sexual abuse when it occurred. Many factors caused this result, as set forth below.

68. Plaintiffs were treated by Strauss in his capacity as a Team Physician through the Athletics Department or at the Sports Medicine Clinic. He was the person officially designated to treat them.

13

69.     Plaintiffs had to pass a pre-season physical in order to participate in their sport.

70.     Before attending OSU, some Plaintiffs had not seen a doctor without their parents being present.

71.     Plaintiffs tended to attribute Strauss' surprisingly "rigorous" genital and rectal examinations to the fact that the physical requirements of intercollegiate sports were much greater than for high school competition.

72.     Plaintiffs were sexually assaulted/abused by Strauss in the context of a purported medical examination, such as when seeing him for a pre-season physical or for a sports-related injury. They came into contact with him under legitimate circumstances and were more likely to interpret what took place in the examination room within that framework of legitimacy.

73.     When Strauss abused Plaintiffs, male sexual abuse was not a commonly acknowledged problem or a commonly discussed topic among non-educators or people outside the fields of medicine and counseling.

74.     Plaintiffs were brought up to believe that doctors are trustworthy and do not intentionally hurt their patients.

75.     Plaintiffs were brought up to believe that a "good" patient is a compliant patient.

76.     Plaintiffs treated by Strauss were placed in a vulnerable position, both physically and emotionally, when Strauss examined them. They were not psychologically predisposed to question Strauss' clinical practices.

77.     There was a huge disparity between Strauss' medical knowledge and the Plaintiffs. They had no standing to challenge his explanations for the things he did to them.

78.     Plaintiffs were on Strauss' "turf" when he examined them in his office with the door closed. Strauss' psychological and educational advantage over each athlete in the

14

examination room was just as great as the athlete's physical advantage over Strauss would have been if they had competed against each other in the athlete's chosen sport.

79.     Plaintiffs went into exams, particularly pre-season physicals, expecting their doctors to touch them.  They knew that doctors often have to touch their patients as part of their work.  Plaintiffs had neither the experience nor education to know the limits of appropriate physical contact during medical examinations.

80.     Plaintiffs attended OSU believing its doctors and medical faculty would inform patients about the medical services they provided to them to the extent they were legally or ethically required to do so.

81.     Plaintiffs entered Strauss' examination rooms presuming that what occurred in a doctor's office was supposed to be confidential. Even under the most normal circumstances, Plaintiffs wanted their genital or rectal examinations to remain confidential because such topics were embarrassing to discuss. When Strauss' examinations became overly aggressive or lingered too long in intimate areas, it made more sense for Plaintiffs to chalk a feeling that something was wrong up to them feeling unwarranted embarrassment or shame. The alternative was to accuse a tenured professor of committing sexual assault and to risk one's athletic scholarship.

82.     Plaintiffs maintained a special relationship with OSU because they were attending on athletic scholarships. Many needed their athletic scholarship to stay in school.  They despised Strauss' medical exams but were willing to endure them if that was a requirement to keep their scholarships.

83.     Plaintiffs maintained a team mentality. No teammate wanted to complain about something he believed his other teammates were having to endure, no matter how unpleasant the experience.

15

84.     Some Plaintiffs feared being ridiculed and ostracized if they complained to teammates about the sexual undertones they perceived during Strauss' medical examinations and their teammates did not admit to having similar experiences with Strauss.

85.     OSU teams always compete at the highest possible level. Plaintiffs were therefore expected to perform at their best. That required Plaintiffs to make sacrifices and go the extra mile with every aspect of their training and preparation. Plaintiffs were not in a position to judge whether a reputed world-class sports physician's overly thorough examinations were improper just because things felt wrong or overly invasive. Plaintiffs thought Strauss to be an elite sports doctor, just like they were elite athletes. Plaintiffs also thought that OSU was a reputable and renowned institution that would protect the interests and well-being of their student athletes and act on any reports of inappropriate behavior by their faculty. Strauss' "thoroughness" felt, extreme, embarrassing, and humiliating to the Plaintiffs, but Plaintiffs believed his physicals were a difficult step forward in their quest for excellence and thought that OSU would have stopped the behavior if it was not furthering that quest.

86.     Plaintiffs, as athletes, were expected to be tough and not to complain.

87.     OSU controlled every aspect of how Strauss interacted with the Plaintiffs. OSU provided the facilities, designated Strauss as their doctor, and controlled their scholarships. Plaintiffs had no say in who treated them.

88.     To the extent any Plaintiffs may have complained about this conduct by Strauss, OSU failed to act upon or otherwise dismissed these concerns.

89.     None of the Plaintiffs had/have received medical education or training, so they had/have no knowledge of medical examination techniques for diagnosing or treating hernias,

16

swollen lymph nodes, or hamstring tears, or medical conditions of the penis, testicles, rectum, prostate, or anus.

90.     None of the Plaintiffs have been trained or educated as to what constitutes inappropriate physical conduct in the context of a doctor-patient relationship.

91.     None of the Plaintiffs have ever been educated or trained regarding what comments or questions are inappropriate for a physician to make during a medical examination.

92.     When Strauss sexually assaulted/abused Plaintiffs in a clinical setting, many of them felt confused as to whether abuse had, in fact, occurred.  While Plaintiffs had strong negative emotions and many felt his exams were medically inappropriate, they also understood that feelings are not facts. Many of them did not appreciate until within the past two years that Strauss touched them in an unlawful manner.

93.     Plaintiffs were expressly or impliedly misled by OSU trainers, coaches, and employees in the Athletics Department into believing that Strauss' sexually abusive examination methods and statements, though unpleasant and embarrassing, were medically acceptable practices.

94.     Plaintiffs were unlikely to think Strauss was committing an act of sexual violence by manipulating their genitals for extended periods because everyone talked openly about Strauss' over-the-top Strauss' genital exams. To a young college student, how could something discussed so openly actually be a criminal act?  Strauss' insistence upon his rigorous genital and rectal exams became an accepted, albeit despised, part of being treated.  Plaintiffs' only recourse was to make nervous jokes in light of their powerlessness over their predicament. A Plaintiff recalls that during his freshman physical, teammates outside Strauss' closed examination room laughed that it was Plaintiff's "first time" – as though Plaintiff was losing his virginity.

95.     Not until within the past two years have Plaintiffs had a reasonable basis for believing OSU had actual knowledge Strauss was sexually abusing male students in a clinical setting.

96.     Not until within the past two years have Plaintiffs had a reasonable basis for believing that OSU concealed or remained deliberately indifferent to the substantial risk that Strauss was sexually abusing them and other male OSU students, particularly student-athletes.

97.     Left to their own means, Plaintiffs had no reasonable way of knowing that OSU had actual knowledge Strauss was sexually abusing male students in a clinical setting.  Plaintiffs also had no way of learning the awful truth about what OSU knew and when, or how OSU chose to permit their continued sexual abuse by Strauss. No exercise of reasonable due diligence would have revealed to them how OSU's acts and omissions caused Plaintiff to suffer independent injuries from the injuries caused by Strauss.

## OSU'S DELIBERATE INDIFFERENCE TOWARDS STRAUSS' CONDUCT

98.      "Beginning as early as Strauss' first year at OSU – and persisting throughout his nearly two decades at the school – students and University staff reported and referred complaints about Strauss to various University employees." (Report at 2).

99.     On information and belief, at all times relevant to this Complaint, persons with the authority to cut-off Strauss' access to patients, to prevent Strauss from sexually abusing patients in a clinical setting, or to implement other corrective measures had, at minimum, actual knowledge there was a substantial likelihood that Strauss was sexually assaulting and abusing male student-athletes and other male OSU students.

100.    As early as 1979, OSU officials with authority to institute corrective measures had information indicating that Strauss posed "a substantial risk of sexual abuse" to male athletes

on OSU's intercollegiate sports teams. Among other things, "[p]ersonnel in the University's Sports medicine program and Athletics Department were aware that Strauss was conducting genital examinations on male athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations." (Report at 2)

101. Through administrators, faculty, and staff, OSU had actual notice of Strauss' sexually abusive conduct. OSU, however, dismissed, disregarded, minimized, refuted, denied, silenced, and even concealed complaints about Strauss' sexual misconduct. At best, OSU chose not to act on information that alerted University faculty, staff, and administrators to a substantial risk that Strauss was sexually abusing Plaintiffs and other male OSU athletes. On information and belief, OSU personnel who were alerted to compelling evidence of Strauss' sexually predatory conduct, but failed to take meaningful action that could have prevented Plaintiffs' injuries, include: Athletic Directors, Assistant Athletic Directors and Associate Athletic Directors; and Head Team Physicians and several team physicians (who were also faculty members).

102. As early as 1979, personnel in the Athletics Department and in the University's Sports Medicine Program knew that Strauss conducted prolonged genital examinations on male students and refused to allow any OSU personnel to witness the examinations. Such personnel also knew "that Strauss showered alongside the male students at Larkins Hall – a practice unique to Strauss among the other team physicians and a practice that the student-athletes repeatedly complained about to their coaches." (Report at 2)

103. Additionally, nurses at Student Health Services worried that Strauss was engaging in sexual conduct with patients because he often showed up unannounced to treat patients not on

the schedule, took unusually long times examining them, conducted examinations behind closed doors, and failed to fill out medical records documenting the medical services he provided.

104.    Strauss was never disciplined for failing to create or complete medical records, even though such records are standard medical practice and important to providing continuity of care.

105.    By failing to insist that Strauss properly document all patient encounters, OSU made it easy for Strauss to lie about every aspect of what took place during patient visits, or even to deny that he had treated a particular student.

106.    OSU never told Strauss to stop showering with the athletes.

107.    OSU never ordered Strauss to have a third person in the room whenever he was treating a male patient.

108.    OSU did not diligently follow up on any of the rumors or reports regarding Strauss until 1994.

109.    At all relevant times, OSU also did not have a meaningful complaint or dispute resolution process for allegations of faculty sexual harassment or abuse.  On information and belief, OSU's faculty dispute procedure instructed complainants to attempt an informal resolution, i.e., a mediation, with the faculty member at issue before going through other channels. It made no sense to recommend that victims of sexual abuse and harassment try to negotiate a resolution with their abusers before seeking formal redress.

110.    At the end of the day, OSU failed the Plaintiffs and Strauss' other victims in every imaginable way. It effectively gave Strauss a green light to prey upon male OSU students as he saw fit.  Strauss took full advantage of every opportunity OSU gave him to assault, abuse, and harass Plaintiffs and other male OSU students.

CONDITIONS AT LARKINS HALL

111.   During the Strauss years, Larkins Hall was in and of itself a constant source of sexual harassment for the male members of the athletics teams based inside it. Larkins Hall was home to a number of OSU sports teams, including wrestling, gymnastics, and swimming.  While Strauss participated in the sexual harassment that took place in Larkins Hall, he did not independently create the sexually hostile environment that affected the Plaintiffs.

112.   All male university faculty and students were allowed to use the same showers as the wrestling team.  An aggressively voyeuristic culture developed where certain non-athletes showered at the same time as wrestlers and soaped their groins vigorously while watching the wrestlers shower.  These individuals, including Strauss, leered at the wrestlers while watching them shower. The voyeurs often stayed in the showers until all the wrestlers had finished – often for an hour or longer.  Some of these individuals were OSU faculty. When the wrestling team changed its practice time, many of the voyeurs shifted their shower times to coincide with the wrestling team's new schedule.

113.   Wrestlers were frequently approached in the bathroom and showers and propositioned for sexual encounters.  One Plaintiff even had notes put in his locker asking him to meet up for sex.

114.   The harassment was so constant that one wrestler called getting to and from the showers "running the gauntlet."

115.   The wrestling room and spaces around it, including the bathroom and a stairwell, became a popular hangout for sexual encounters. Coach Hellickson found people having sex in a bathroom stall, in a stairwell, in the wrestling room, and in other areas. It was not uncommon for Hellickson to see people engaging in sexual activity inside Larkins Hall.

116.    One of the Plaintiffs, a wrestler, was sexually assaulted by a man who grabbed and tried to fondle him as the wrestler was showering. The resulting physical confrontation worried Hellickson about the possibility things might get violent in the future. Larkins Hall was not a safe space for the male athletes who shared lockers or facilities with non-team members.

117.    Hellickson repeatedly complained to OSU administrators about the environment in Larkins Hall because the conditions seriously impacted the psyche and morale of his wrestlers.

118.    Hellickson requested a separate team shower area. OSU denied his request.

119.    Hellickson begged to have the wrestling team moved to another building. OSU denied his request.

120.    When Hellickson tried to get people to leave because they were ogling the wrestlers and taking hour-long showers, they said it was their right to shower when and for as long as they wanted.  They denied staring at the wrestlers. University police would not make them leave.

121.    Larkins Hall became an unsafe space and sexually hostile environment for wrestlers and some of the other male athletes whose teams were based there.

**CLAIM FOR RELIEF**
**COUNT I: Violation of Title IX**
**20 U.S.C. § 1681(a),** *et seq.*
**Heightened Risk Claim**

122.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

123.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

124.    Title IX is implemented through the Code of Federal Regulations. See 33 C.F.R. Part 106. 33 C.F.R. § 106.8(b), which provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

125.    As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

126.    Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

127.    Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties.

128.    At all relevant times, OSU received federal financial assistance and is therefore subject to Title IX.

129.    Title IX required OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

130.    Strauss committed his unlawful acts while working for OSU as a tenured faculty member, Team Physician, and Sports Medicine Physician.

131.    Strauss's sexual assault, abuse, molestation, and harassment of Plaintiffs—which included, among other things, fondling their testicles, fondling their penises, digitally penetrating their rectums, rubbing his erect penis on their bodies, and making inappropriate sexualized comments—was sex discrimination under Title IX.

132.     OSU was required to promptly investigate and address Plaintiffs' (and other OSU students') allegations, reports and/or complaints of sexually abusive or harassing behavior by Strauss.

133.     OSU had actual knowledge of the serial sexual assault, abuse, and molestation committed by Strauss.

134.     Specifically, OSU knew about Strauss's sexual assault, abuse, and molestation through OSU personnel with authority to take corrective action to address it. Such personnel included but were not limited to: Athletic Directors and Assistant Athletic Directors, and Head Team Physicians and several team physicians (who were also faculty members).

135.     Throughout Strauss's 20-year tenure at OSU, students, student-athletes, and coaches conveyed complaints and concerns to OSU administrators and employees about Strauss's inappropriate sexual conduct.

136.     Given the magnitude of Strauss's abuse—involving students and student- athletes he evaluated and treated over two decades—it would be implausible for OSU to claim that it did not know about Strauss's sexual abuse.

137.     Nonetheless, OSU did nothing to address the complaints and concerns about Strauss.

138.     OSU's failure to respond promptly and adequately to allegations of Strauss's abuse constitutes sex discrimination, in violation of Title IX.

139.     By its acts and omissions, OSU acted with deliberate indifference to the sexual abuse and harassment that Plaintiffs and other male OSU students were experiencing. OSU's deliberate indifference included, without limitation:

a. Failing to respond to allegations of Strauss' sexual assault, abuse, and molestation;

b. Failing to promptly and adequately investigate allegations of Strauss's sexual assault, abuse, and molestation;

c. Requiring male athletes to see Strauss for annual physicals and medical treatment, despite widespread knowledge and complaints about Strauss's abuse;

d. Allowing Strauss (and other sexual predators) to roam freely in Larkins Hall;

e. Allowing Strauss to work as a physician in Student Health Services, despite widespread knowledge and complaints about Strauss's abuse of male student-athletes;

f. Failing to adequately supervise Strauss, after learning that he posed a substantial risk to the safety of male students and student-athletes;

g. Failing to require that Strauss properly document all patient encounters;

h. Failing to take corrective action to prevent Strauss from sexually assaulting, abusing, and molesting other students; and

i. Failing to have in place an effective sexual harassment policy that allowed students to bring complaints without first having to try to resolve complaints of sexual harassment informally with the alleged abuser.

140.   OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss's sexual misconduct caused Plaintiffs (and other male OSU students) to experience further sexual harassment and/or made them vulnerable to it.

141.   OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss's sexual misconduct created a sexually hostile environment that

effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care.

142. As a direct and proximate result of OSU's violation of Plaintiffs' rights under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and have incurred various personal expenses.

**COUNT II: Violation of Title IX**
**20 U.S.C. § 1681(a), *et seq.* Hostile Environment**

143. Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

144. Plaintiffs whose teams were based out of Larkins Hall between 1978 and 1998 (collectively "Larkins Plaintiffs") were entitled to use the athletics facilities free from sexual harassment. However, the pervading and constant sexual harassment they received within Larkins Hall created a hostile environment. The hostile environment these Larkins Plaintiffs suffered in Larkins Hall facilities was so severe, pervasive, and objectively offensive that it effectively barred said Larkins Plaintiffs from access to numerous educational opportunities and benefits, including but not limited to: full use and enjoyment of practice facilities, showers, and locker rooms; and full use and enjoyment of their athletic scholarships and memberships on OSU's sports teams.

145. The sexually hostile environment inside Larkins Hall during the aforementioned period constituted sex discrimination in violation of Title IX.

146. Between 1978 and 1998, OSU officials in a position to implement corrective measures had actual knowledge that the Larkins Plaintiffs and other male OSU student-athletes were being subjected to a sexually hostile and abusive environment inside Larkins Hall.

147. OSU owed the Larkins Plaintiffs a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

148. Such OSU officials showed deliberate indifference towards the safety of the Larkins Hall Plaintiffs and other male student-athletes who used the Larkins Hall facilities between 1978-1998.

149. OSU violated Title IX by failing to remedy the sexually hostile and abusive environment in Larkins Hall.

150. As a direct and proximate result of OSU's violation of the Larkins Plaintiffs' rights under Title IX, the Larkins Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and incurred various personal expenses.

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Enter judgment in favor of Plaintiffs on their claim for discrimination under Count I Title IX against Defendant The Ohio State University;

(b) Enter judgment in favor of the Larkins Plaintiffs on their claim for discrimination under Count II Title IX against Defendant The Ohio State University;

(c)     Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

(e)     Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

(f)     Award Plaintiffs pre-judgment and post-judgment interest;

(g)     Award Plaintiffs their court costs and expenses, including attorney's fees, pursuant to 41 U.S.C. § 1988(b); and

(h)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,


s/ Richard W. Schulte

_____

**Richard W. Schulte (0066030)**
**WRIGHT & SCHULTE, LLC**
865 S. Dixie Dr.
Vandalia, OH 45377
937-434-9999
937-434-7511 facsimile
rschulte@yourlegalhelp.com

*/s/ Dennis P. Mulvihill*

**Dennis P. Mulvihill (0063896)**
**WRIGHT & SCHULTE, LLC**
23139 Chagrin Blvd., Suite 620
Cleveland, OH 44022-5468
(216) 591-0132
(216) 591-0622 facsimile
dmulvihill@yourlegalhelp.com